**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

UPEQUITY SPV1, LLC,

     Plaintiff/Counter-Defendant,

v.                                                    Case No. 3:24-cv-341-MMH-PDB

ROBERT AND CINDY LOU
BIGLEY,

     Defendants/Counter-Plaintiffs.

_____

## **O R D E R**

**THIS CAUSE** is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 99; Plaintiff's Motion) and Defendants/Counter-Plaintiffs Robert and Cindy Bigley's Motion for Summary Judgment (Doc. 100; Defendants' Motion), both filed on January 30, 2026. On February 13, 2026, Defendants/Counter-Plaintiffs Robert and Cindy Lou Bigley (the Bigleys) filed a response in opposition to Plaintiff's Motion. See Defendants' Response in Opposition to Plaintiff UpEquity's Motion for Summary Judgment (Doc. 102; Defendants' Response). And, on February 20, 2026, Plaintiff/Counter-Defendant UpEquity SPV1, LLC (UpEquity) filed a response to Defendants' Motion. See Plaintiff's Response in Opposition to Defendants' Motion for

Summary Judgment (Doc. 103; Plaintiff's Response). Accordingly, this matter is ripe for review.

## I.  Background

### A. The Trade Up Process

In 2022 and 2023, UpEquity offered a trade up service for residential mortgages. See Doc. 99-2 (Trade Up Agreement) at 1; Deposition of Stephani Cute (Doc. 100-1; Cute Dep.) at 19.[1] The trade up service consisted of three steps: (1) UpEquity would purchase and become the owner of its client's home (the Old Home), (2) the client would buy a new home with the proceeds from the Old Home, and (3) the client and UpEquity would sell the Old Home to another buyer. See Trade Up Agreement at 2, 5; Cute Dep. at 16–17. The terms of the trade up service were memorialized in the UpEquity Trade Up Agreement. See generally Trade Up Agreement. Under the agreement, for 180 days following UpEquity's purchase of the Old Home, the client would maintain "control of marketing the property as well as negotiating and accepting" resale offers. See Trade Up Agreement at 5; Cute Dep. at 49–51. If the property remained on the market for more than 180 days, UpEquity would assume exclusive control over the resale process. See Trade Up Agreement at 5; Cute Dep. at 50–51. Although UpEquity assured its clients that it would "use [its] best efforts to maximize the

---

[1] Any citation to a page of a deposition will refer to the pagination assigned by the CM/ECF page number—not the page number assigned by the court reporter—unless otherwise indicated by the Court.

ultimate purchase price," it advised that it could not guarantee that it would sell the client's home for a particular price. See Trade Up Agreement at 1 n.1, 5. However, clients could retain control of the resale process after the 180-day mark if they chose to make monthly payments of 1% of the price UpEquity paid to purchase the Old Home (the UpEquity Purchase Price). See id. at 5; Cute Dep. at 50–51.

Pursuant to the terms of the Trade Up Agreement, once the client's home sold, UpEquity would subtract two values from the resale price: the Cost Basis and the Resale Costs. See Trade Up Agreement at 5. The Cost Basis consisted of the sum of the UpEquity Purchase Price and any carrying costs that UpEquity incurred, which would include the costs of buying the client's home, insurance, and administrative costs.[2] See id. at 5. The Resale Costs included "[t]he costs, fees, and concessions associated with" UpEquity selling the client's home to a subsequent buyer, "property taxes, assessments, and Homeowner's Association Dues," and "any penalties incurred" by UpEquity to maintain the Old Home's utility services prior to closing the resale. See id. If the resale price exceeded the sum of the Cost Basis and the Resale Costs, the Trade Up

---

[2] Under the Trade Up Agreement, the Cost Basis increased every 30 days up until the 180th day of UpEquity's ownership of the client's Old Home. See Trade Up Agreement at 8; Cute Dep. at 78. Accordingly, there are six different Cost Basis amounts. See Trade Up Agreement at 8. For example, if the Bigleys' Old Home sold within thirty days of UpEquity's ownership, UpEquity would deduct the first Cost Basis of $616,009 from the resale price. See id. However, if the Old Home sold between days thirty-one and sixty, UpEquity would deduct the second Cost Basis of $618,565 from the resale price. See id.

Agreement required UpEquity to transfer the surplus to the client within fourteen days of the resale closing. See id. But if the sum of the Cost Basis and Resale Costs exceeded the resale price, resulting in a deficit, the client would be required to pay UpEquity the deficit within fourteen days of the resale closing. See id. In exchange for its assistance in buying the new home and selling the Old Home, UpEquity charged clients a convenience fee that was typically 1.75% of the resale price but could be reduced depending on other factors.[3] See id. at 6; Cute Dep. at 67.

### B. The Bigleys' Trade Up Experience

In 2022, Robert and Cindy Lou Bigley owned a home in Green Cove Springs, Florida. See Affidavit of Stephani Cute in Support of Plaintiff's Motion for Summary Judgment (Doc. 99-1; Cute Aff.) ¶¶ 9–11. On November 23, 2022, the Bigleys entered into the Trade Up Agreement with UpEquity. See id. ¶ 10; Trade Up Agreement at 7. In the Trade Up Agreement, UpEquity described the trade up process, see generally Trade Up Agreement, and provided an illustration of the amount of money the Bigleys would earn after all costs were deducted if their home sold for their realtor's estimated list price of $950,000, see id. at 1; Cute Dep. at 40, 42. On November 29, 2022, the Bigleys agreed to

---

[3] The other factors included: (1) clients selling their Old Homes to "an unaffiliated 3rd party and clos[ing] the transaction prior to the closing date of the UpEquity Purchase," and (2) clients financing the purchase of their new home with an UpEquity-affiliated lender. See Trade Up Agreement at 6.

sell their home to UpEquity for $613,453. See "AS IS" Residential Contract for Sale and Purchase (Doc. 99-3; Old Home Sale Contract) at 1, 12. And, on December 23, 2022, the Bigleys formalized their agreement to purchase a home in Middleburg, Florida, for $345,000. See Purchase and Sale Agreement (Doc. 99-6; New Home Sale Contract) at 1, 11. A few weeks later, on January 9, 2023, UpEquity closed on the purchase of the Bigleys' home, see Doc. 99-4 (Old Home Closing Contract) at 1–2, and the Bigleys executed a warranty deed acknowledging receipt of payment from, and transferring ownership of the Old Home to, UpEquity, see Warranty Deed (Doc. 99-5; Warranty Deed) at 1.

After selling their Old Home to UpEquity, the Bigleys chose a resale listing price of $899,000. See Cute Aff. ¶ 18. However, they "quickly reduc[ed] the price to $775,000." Id. While the Bigleys' Old Home was on the market, UpEquity employees updated the Bigleys about where they stood in the trade up process. See, e.g., Doc. 99-7 (First Email Correspondence) at 2 ("UpEquity . . . has been the Title Owner for approximately 23 days, however Cindylou [sic] and Robert still maintain the control of the property's listing and resale at full market value."); Doc. 99-8 (Second Email Correspondence) at 1 ("Also, as of today, we are on day 112 of UpEquity owning the home, putting us at the fourth cost basis."); see also Cute Dep. at 57–58, 70–71. On June 9, July 11, and July 12, 2023—days 150, 183, and 184 of UpEquity's ownership of the Old Home, respectively—UpEquity representatives asked the Bigleys if they wanted to

retain control of the resale process beyond the 180-day mark. See Second Email Correspondence at 3; Doc. 99-9 (Third Email Correspondence) at 2, 4. And, on July 12, 2023, the Bigleys declined. See Third Email Correspondence at 2.

For the first month and a half that it had control of the resale process, UpEquity retained the Bigleys' realtor, and the realtor relisted the Old Home at $725,000. See Cute Aff. ¶ 19; Cute Dep. at 58, 62. However, because the realtor continued to fail to secure a buyer, see Cute Aff. ¶ 19, UpEquity engaged a new realtor on August 31, 2023, see id.; see generally Change Authorization (Doc. 99-10; Realtor Change Form). UpEquity's new realtor reduced the listing price of the Old Home to $600,000 because "the Bigleys had overpriced the Property" and the realtor believed that a price reduction "was necessary in order to secure a sale." See Cute Aff. ¶ 20; see also Cute Dep. at 62. On September 7, 2023, UpEquity entered into an agreement to sell the Bigleys' Old Home for $535,000. See Purchase and Sale Agreement (Doc. 99-11; Old Home Resale Contract) at 1, 11; Cute Dep. at 62. And, on October 3, 2023, the parties finalized the resale. See Cute Aff. ¶ 23.

After UpEquity sold the Bigleys' Old Home, it determined that there was a deficit of $156,757.08 between the resale price and the sum of the Cost Basis and Resale Costs. See generally Doc. 99-12 (Final Invoice); Cute Aff. ¶ 24; Cute Dep. at 65. UpEquity informed the Bigleys of the deficit once it finalized the resale, and the Bigleys failed to remit payment as required. See Cute Aff. ¶¶

23, 25; see generally Final Invoice. Consequently, UpEquity sent a demand letter to the Bigleys on October 20, 2023, reminding the Bigleys of their obligation to remit the deficit to UpEquity. See Cute Aff. ¶ 25; see generally Doc. 99-13 (Demand Letter). As of December 31, 2025, the Bigleys continued to refuse to pay the deficit. See Cute Aff. ¶ 26.

On April 4, 2024, UpEquity initiated this lawsuit against the Bigleys. See generally Doc. 1. In its operative Second Amended Complaint (Doc. 16; Complaint), filed on May 9, 2024, UpEquity asserts a breach of contract claim. See Complaint at 5. The Bigleys bring two counterclaims against UpEquity for: (1) breach of contract, and (2) bad faith dealings. See Counterclaim (Doc. 29; Counterclaims), filed August 26, 2024, at 4–5. Both UpEquity and the Bigleys have moved for summary judgment to be entered in their favor and against the opposing party. See generally Plaintiff's Motion; Defendants' Motion.

## II.    Legal Standard

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

materials." Rule 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

In citing to Campbell, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal quotations omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). Notably, the instant action is before the Court on cross-motions seeking summary judgment. "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." T-Mobile S. LLC v. City of Jacksonville, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). Instead, applying the same principles, "the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." Id.

## III. Discussion

In Plaintiff's Motion, UpEquity asks the Court to grant summary judgment in its favor on its breach of contract claim and against the Bigleys on their breach of contract and bad faith dealings claims. See Plaintiff's Motion at 11–20. In Defendants' Motion,[5] the Bigleys ask the Court to grant summary judgment in their favor on their breach of contract and bad faith dealings claims[6] and against UpEquity on its breach of contract claim.[7] See Defendants'

---

[5] The Court notes that Defendants' Motion is deficient because, beyond the "Statement of Material Undisputed Facts," the Bigleys do not provide any citations to the record to support their contentions. Compare Defendants' Motion at 2–3 (providing record citations) with id. at 4–7 (omitting record citations). Rule 56 requires parties claiming that there is a genuine dispute of material fact to "support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(c)(1). By failing to include record citations in the "Argument," the Bigleys have not complied with Rule 56.

[6] In addition to these claims in Defendants' Motion, the Bigleys attempt to raise three other claims for the first time: fraud in the inducement, deceptive trade practices under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), and unjust enrichment. Compare Counterclaims at 4–5 (bringing counterclaims for breach of contract and bad faith dealings) with Defendants' Motion at 5–7 (discussing breach of contract, bad faith dealings, fraud in the inducement, deceptive trade practices, and unjust enrichment). A defendant may not amend his answer and affirmative defenses, or seek to assert a counterclaim through argument, in a brief supporting or opposing a motion for summary judgment. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004). Moreover, at this stage of the proceeding, any motion for leave to amend or to assert a counterclaim would raise questions of "extreme untimeliness." See Smith v. Sch. Bd. of Orange Cnty., 487 F.3d 1361, 1367 (11th Cir. 2007); see also e.g. Millennium Partners, L.P. v. Colmar Storage, LLC, 494 F.3d 1293, 1298–99 (11th Cir. 2007) (defendant failed to demonstrate good cause for seeking leave to amend answer to add affirmative defense after scheduling order deadline). Therefore, these new claims are not properly before the Court, and the Court will disregard them.

[7] The Bigleys also assert that "UpEquity seeks restitution through unjust enrichment," see Defendants' Motion at 5, but, as far as the Court can discern, UpEquity only seeks damages for breach of contract, see Complaint at 5–6 ("WHEREFORE, Plaintiff, UpEquity, demands judgment be entered against Defendants for damages in an amount no less than $156,757.08 plus all past, current, and further accruing interest, default interest, attorneys' fees, costs, and for any other relief this Honorable Court deems just and proper."). As such, this contention is without merit.

Motion at 4–6. Upon review, the Court finds that Plaintiff's Motion is due to be granted, and Defendants' Motion is due to be denied.

### A. Breach of Contract Claims

Under Florida law, "[t]he elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." Beck v. Lazard Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999). The Court will consider whether UpEquity or the Bigleys established each of these elements.

### 1. Valid Contract

As to the first element, the undisputed evidence establishes that the parties entered into a valid contract. A valid contract "is generally composed of four basic elements: offer, acceptance, consideration, and sufficient specification of essential terms." Rauch, Weaver, Norfleet, Kurtz & Co. v. AJP Pine Island Warehouses, Inc., 313 So. 3d 625, 630 (Fla. 4th DCA 2021). As the Trade Up Agreement shows, the parties formed a contract when UpEquity offered the Bigleys its trade up service in exchange for a convenience fee and any deficit between the resale price and the sum of the Cost Basis and Resale Costs, and the Bigleys accepted by signing the agreement. See generally Trade Up Agreement.

The Bigleys assert that the Trade Up Agreement is invalid because the valuation term of $950,000 is essential, unsubstantiated, and misrepresented. See Defendants' Motion at 4–5. Under Florida law, the parties to a contract

- 11 -

must agree on all essential terms of the contract. King v. Bray, 867 So. 2d 1224, 1228 (Fla. 5th DCA 2004). "[W]hat constitutes an essential term of a contract will vary widely according to the nature and complexity of each transaction and must be evaluated on a case specific basis." ABC Liquors, Inc. v. Centimark Corp., 967 So. 2d 1053, 1056 (Fla. 5th DCA 2007). The $950,000 figure appears on the first page of the Trade Up Agreement both under the heading "Estimated Market Value" and in a chart showing a sample calculation of costs during the trade up process. See Trade Up Agreement at 1 (emphasis added). In the Trade Up Agreement, UpEquity plainly states that the $950,000 estimated market value "is based on [the Bigleys'] and [the Bigleys'] Realtor's estimated list price" and "UpEquity cannot guarantee a sales price or market value." See Trade Up Agreement at 1 & n.1 (emphasis added). Additionally, UpEquity explains that other values in the chart on the first page of the Trade Up Agreement, including the "Gross Resale Price, Actual Resale Costs and UpEquity Cost Basis[,] are estimated for illustrative purposes only." Id. (emphasis added). This language reflects that UpEquity used the $950,000 figure to demonstrate how the various costs outlined in the Trade Up Agreement are deducted at each stage of the trade up process.[8] Accordingly, after examining the nature and complexity of

---

[8] In Defendants' Response, the Bigleys also argue that Stephani Cute's deposition testimony shows that UpEquity used an automated valuation model (AVM) to determine that the Bigleys' Old Home was worth $950,000. See Response at 2, 5, 8. Setting aside whether any issue of fact that this contention raises is material, the Bigleys grossly misrepresent Stephani Cute's testimony. Cute repeatedly testified that the $950,000 figure in the Trade Up

the transaction between the Bigleys and UpEquity, see ABC Liquors, 967 So. 2d at 1056, the Court concludes that the $950,000 estimated market value is not an essential term of the Trade Up Agreement. Thus, there is no genuine dispute of material fact as to whether the Trade Up Agreement is a valid contract.

### 2. Material Breach

As to the second element, UpEquity has established that the Bigleys committed a material breach by failing to remit payment for the deficit. A material breach of contract occurs when a party, without legal excuse, fails to perform any obligation under the contract and the failure to perform "go[es] to the essence of the contract." Covelli Fam., L.P. v. ABG5, L.L.C., 977 So. 2d 749, 752 (Fla. 4th DCA 2008) (quoting Beefy Trail, Inc. v. Beefy King Int'l, Inc., 267 So. 2d 853, 857 (Fla. 4th DCA 1972)); Schwarz v. Seeman Holtz Prop. & Cas., LLC, No. 21-81005-CIV-SMITH, 2022 WL 3682208, at *2 (S.D. Fla. Mar. 15, 2022). It is undisputed that the Trade Up Agreement requires the Bigleys to remit any deficit between the resale price and the sum of the Cost Basis and Resale Costs to UpEquity. See Trade Up Agreement at 5. And there is no

---

Agreement was an "estimated market value" based on "what the property [was] currently listed at or what the listing agent intend[ed] to list the property for," not the AVM. See Cute Dep. at 40; see also id. at 39–43. And she explained that UpEquity uses the AVM to inform the offers that it makes its clients during the first phase of the trade up process. See id. at 36–37, 43, 45. In any event, the Trade Up Agreement plainly contradicts the Bigleys' assertions about where the $950,000 estimated market value came from, as discussed above.

dispute that the resale of the Bigleys' Old Home resulted in a deficit of $156,757.08. See Cute Aff. ¶ 24; Cute Dep. at 65; see generally Final Invoice; Demand Letter. Moreover, it is undisputed that UpEquity "sent the Bigleys a final invoice by letter and via a billing software platform," see Cute Aff. ¶ 23, and, as of December 31, 2025, the Bigleys had not paid UpEquity the deficit, see id. ¶ 26. Finally, the Bigleys do not argue and have not produced any evidence that they have since paid UpEquity the deficit. See generally Defendants' Motion; Defendants' Response. Thus, there is no genuine dispute of material fact as to whether the Bigleys failed to pay UpEquity. And, because UpEquity provided the trade up service partially in exchange for payment of any resulting deficit, the Bigleys' failure to remit payment of the deficit goes to the "essence of the contract" and constitutes a material breach. See Covelli Fam., 977 So. 2d at 752.

Conversely, the Bigleys have failed to demonstrate that UpEquity breached the Trade Up Agreement. Under the Trade Up Agreement, UpEquity was required to (1) buy the Bigleys' Old Home, (2) sell the Old Home if over 180 days elapsed and the Bigleys' relinquished control by declining to pay the control retention fee, and (3) pay the Bigleys any resulting surplus. See generally Trade Up Agreement. The record shows that UpEquity (1) signed a contract to buy the Old Home for $613,453 on November 28, 2022, see Old Home Sale Contract at 1, 12, (2) closed the sale on January 9, 2023, see Old Home

Closing Contract at 1–2; Warranty Deed at 1, (3) took control of the resale on July 12, 2023, see Third Email Correspondence at 2, and (4) entered into an agreement to sell the Old Home on September 7, 2023, see Old Home Resale Contract at 1, 11. The Bigleys have not produced any evidence that calls these facts into question. See generally Defendants' Motion; Defendants' Response. Instead, the Bigleys contend in Defendants' Motion that UpEquity breached the Trade Up Agreement in three ways: (1) by failing to disclose its valuation methodology, (2) by recording deed interests and selling their Old Home without a fair accounting, and (3) by withholding proceeds that should have been split equitably. See Defendants' Motion at 6. And, in Defendants' Response, they add two additional theories of breach: (4) UpEquity breached the contract by selling their Old Home for $535,000—which they believe was below fair market value, and (5) UpEquity breached the contract by selling the Old Home without a contemporaneous, independent appraisal of the value. See Defendants' Response at 3, 5. All of these theories of breach fail.

The Bigleys' first, second, and fifth arguments are unavailing because they are unsupported by the record. Indeed, the Bigleys have produced no evidence showing that UpEquity was required to disclose its valuation methodology, provide a fair accounting of the resale prior to recording the deed, or obtain an independent appraisal of the home prior to resale. See generally Defendants' Motion. Thus, the undisputed record evidence shows that

UpEquity did not breach the Trade Up Agreement by failing to take these actions.

The Bigleys' third and fourth arguments also fail because they are plainly refuted by the record. Nothing in the Trade Up Agreement entitles the Bigleys to an equitable distribution of the $535,000 resale price. See generally Trade Up Agreement. To the contrary, the Trade Up Agreement only contemplates payment to the Bigleys "[i]f UpEquity receives a Net Resale Price in excess of the UpEquity Cost Basis." See id. at 5. And, even then, all that the Bigleys would receive in the event of a surplus would be the surplus—not the entire, or an equitable distribution of the, resale price. See id. Importantly, the undisputed record evidence establishes that the difference between the resale price and the sum of the Cost Basis and Resale Costs was a deficit, not a surplus. See generally Final Invoice; Demand Letter. Therefore, the Bigleys are not entitled to any share of the resale price; in fact, they owe UpEquity the deficit. Next, the Trade Up Agreement does not require UpEquity to sell the client's home at fair market value. See generally Trade Up Agreement. Indeed, the Trade Up Agreement places no restrictions on the resale after UpEquity takes control, see generally id., and it explicitly states that UpEquity cannot guarantee a resale price, see id. at 1 n.1, 5. Consistent with the terms of the Trade Up Agreement, in the Second Email Correspondence, UpEquity informed the Bigleys that, if it took control of the resale, it could not "guarantee that [it

- 16 -

would] not accept a lower offer than the Bigleys would have accepted." See Second Email Correspondence at 3. UpEquity also explained that its primary goal upon taking control of the resale would be "to sell the house as soon as possible." Id. Therefore, it is undisputed that UpEquity did not breach by selling the Old Home for $535,000. And, consequently, the record does not support any of the Bigleys' arguments regarding the breach element, and their breach of contract claim fails.

### 3. Damages

As to the third element of its breach of contract claim, UpEquity has established that it suffered damages as a result of the Bigleys' breach. Under Florida law, a plaintiff can "collect only those damages either arising naturally from the breach or contemplated by the parties at the time of the contract." Pinnacle Port Cmty. Ass'n v. Orenstein, 952 F.2d 375, 379 (11th Cir. 1992). Accordingly, damages are only available if they "could have reasonably been expected to flow from the breach." T.D.S. Inc. v. Shelby Mut. Ins. Co., 760 F.2d 1520, 1531 n.11 (11th Cir. 1985). The Trade Up Agreement outlines various costs that UpEquity would incur during the trade up process—specifically, the Cost Basis and Resale Costs—and it holds the client responsible for them by subtracting them from the resale price. See Trade Up Agreement at 5. The Final Invoice establishes the exact values of each of the costs that UpEquity expended during the Bigleys' trade up process. See generally Final Invoice. Specifically,

it shows that, for the Bigley transaction, the Cost Basis was $638,502 and the Resale Costs were $53,388.61.[9] See generally id. After factoring in a $121.44 county tax credit and a $12.09 assessment credit, UpEquity deducted the Cost Basis and Resale Costs from the resale price of $535,000 and determined that the deficit was $156,757.08. See id. Moreover, in both her deposition and the Cute Affidavit, Stephani Cute confirms that the deficit owed by the Bigleys pursuant to the Trade Up Agreement was $156,757.08. See Cute Aff. ¶ 24; Cute Dep. at 65.

The Bigleys have produced no evidence that calls the amount of the deficit into question. See generally Defendants' Motion; Defendants' Response. Instead, they argue that UpEquity "cannot establish recoverable damages with specificity," see Defendants' Motion at 5, and the damages that UpEquity demands are "speculative or self-created," see Defendants' Response at 7. However, invoices, affidavits, and depositions outlining the monetary losses suffered by a party are suitable evidence to establish that the party suffered damages for the purposes of a motion for summary judgment. See, e.g., Volvo Aero Leasing, LLC v. VAS Aero Servs., LLC, 268 So. 3d 785, 790–91 (Fla. 4th

---

[9] The Court notes that, although none of the values in the Final Invoice are designated as falling within the category of Resale Costs, all dollar amounts listed on the Final Invoice other than the resale price, tax and assessment credits, and Cost Basis appear to fall within the meaning of Resale Costs as defined in the Trade Up Agreement. See Trade Up Agreement at 5; see generally Final Invoice. Therefore, to confirm the accuracy of UpEquity's claimed $156,757.08 deficit, the Court added all of the individual Resale Costs together and determined that the total amount of Resale Costs was $53,388.61.

DCA 2019). Therefore, the Court concludes that the Final Invoice, Cute Deposition, and Cute Affidavit show that UpEquity suffered damages with sufficient specificity and without speculation. Additionally, nothing in the record supports the Bigleys' assertion that UpEquity's losses were "self-created." See generally Plaintiff's Motion; Defendants' Motion.[10] Accordingly, there is no genuine dispute of material fact as to whether UpEquity suffered damages. And, given that each element of UpEquity's breach of contract claim is undisputed, Plaintiff's Motion is due to be granted to the extent that UpEquity is entitled to summary judgment in its favor on both its breach of contract claim and the Bigleys' breach of contract claim.

## B. The Bigleys' Bad Faith Dealings Claim

It appears that the Bigleys' bad faith dealings claim is rooted in the implied covenant of good faith and fair dealing. See Defendants' Motion at 6; Defendants' Response at 7. "[E]very contract includes an implied covenant that the parties will perform in good faith." See County of Brevard v. Miorelli Eng'g, Inc., 703 So. 2d 1049, 1050 (Fla. 1997). However, "a duty of good faith . . . is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the

---

[10] The Court notes that the Bigleys have produced no evidence that they suffered damages. See generally Defendants' Motion; Defendants' Response. Indeed, they do not discuss the damages element at all in Defendants' Motion and Defendants' Response. See generally Defendants' Motion; Defendants' Response.

contract requirements." See Burger King Corp. v. Weaver, 169 F.3d 1310, 1316 (11th Cir. 1999); Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1151 (11th Cir. 2005); Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 896 So. 2d 787, 791–92 (Fla. 2d DCA 2005). Indeed, "an action for breach of the implied covenant of good faith cannot be maintained in the absence of breach of an express contract provision." Burger King Corp., 169 F.3d at 1316. As discussed above, there is no genuine dispute of material fact as to whether UpEquity fully performed under the contract. See supra at 14–15. Additionally, even if bad faith dealings were an independent cause of action, there is no evidence that UpEquity failed to act in good faith. See generally Defendants' Motion. Therefore, Plaintiff's Motion is due to be granted as to the bad faith dealings claim, and, as a result, Defendants' Motion is due to be denied.

## IV.   Conclusion

UpEquity has carried its Rule 56 burden by establishing that the Bigleys breached the Trade Up Agreement, and the Bigleys have failed to show that there is a genuine dispute as to any material fact bearing on that claim. The Bigleys, on the other hand, have failed to carry their burden because it is undisputed that UpEquity fully performed under the Trade Up Agreement, and there is no evidence that UpEquity did not act in good faith. Therefore, Plaintiff's Motion is due to be granted, and Defendants' Motion is due to be

denied. The Court will enter summary judgment in favor of UpEquity on its breach of contract claim, the Bigleys' breach of contract claim, and the Bigleys' bad faith dealings claim.

Accordingly, it is

**ORDERED:**

1. Plaintiff's Motion for Summary Judgment (Doc. 99) is **GRANTED**.

2. Defendants/Counter-Plaintiffs Robert and Cindy Bigley's Motion for Summary Judgment (Doc. 100) is **DENIED**.

3. The Clerk of the Court is **DIRECTED** to enter judgment in favor of Plaintiff UpEquity SPV1, LLC, and against Defendants Robert and Cindy Lou Bigley for the sum of $156,757.08 on UpEquity's breach of contract claim and in favor of Counter-Defendant UpEquity and against Counter-Plaintiffs Robert and Cindy Lou Bigley on the Bigleys' breach of contract and bad faith dealings counterclaims.

4. The Clerk of the Court is further **DIRECTED** to terminate any pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 1st day of June, 2026.

**MARCIA MORALES HOWARD**
United States District Judge

- 21 -

lc36
Copies to:
Counsel of Record